UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| GRISELDA WILSON, | ) | Civil Action No. 4:17-cv-3318-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| GENESIS HEALTHCARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. INTRODUCTION

This action arises from Plaintiff's employment and termination of employment with Defendant. Plaintiff asserts claims of race and sex discrimination in violation of the Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. Plaintiff also asserts state law claims for violation of the South Carolina Human Affairs Law, S.C. Code Ann. § 1-13-10 et seq. and wrongful termination in violation of public policy. Presently before the court is Defendant's Motion for Summary Judgment (ECF No. 44). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. This report and recommendation is entered for review by the district judge.

## II. FACTS

Plaintiff, a black female, has been a pharmacist for 23 years. She was hired as a staff pharmacist with Defendant on April 13, 2015. Employee File (Ex. 1 to Def. Motion). She received $62.50 per hour and reported to Mark Matthews. Employee File. At the time she was hired, she acknowledged that her employment was "at will." Employee File.

Another staff pharmacist, Tripp Byrd, a white male, was chosen by Paul Fulbright[1] to be the Pharmacy Operations (or Workflow) Manager.[2] Byrd Dep. 6-7 (Ex. A to Pl. Resp.). He was also supervised by Mark Matthews. Byrd Dep. 7. Byrd did not apply for the position; he was simply told by Fulbright that it was a role they would like for him to fill. Byrd Dep. 7. At the time, he was paid $62.50 per hour, and he did not receive a raise when he was appointed to the new position. Byrd Dep. 7; Employee File. As Operations Manager, Byrd's responsibility was to manage the workflow of the pharmacy to make filling prescriptions more efficient. Byrd Dep. 6-7. In October of 2015, Byrd was given a raise to $65.00 per hour for assuming the responsibility of the pharmacist in charge of the Specialty Pharmacy. Employee File.

At some point during his time as Operations Manager, Byrd felt as though the technicians did not really respect the pharmacists because they realized no one "had true authority over the floor back there." Byrd Dep. 8. Also, if he tried to implement something new, it would generally be overruled and changed by "administration," meaning Paul Fulbright and Mark Matthews. Byrd Dep. 8-9. At some point Byrd decided that he no longer wanted to be Operations Manager because he felt it was just a title and he had no real authority to accomplish anything, but he did not discuss this with Matthews. Byrd Dep. 9-10. In January of 2016, after returning from a few days of vacation, Matthews called Byrd into his office and told him he was not happy with "the way things were" and that he wanted to let Plaintiff have a shot at the Operations Manager position. Byrd Dep. 10. Matthews told Byrd that he would not receive a reduction in pay and he could focus more on the Speciality Pharmacy. Byrd Dep. 10.

---

[1] It is not clear from the record what position Fulbright held.

[2] The terms "Operations Manager" and "Workflow Manager" are used interchangeably throughout the record.

At some point after Byrd was no longer Operations Manager, he submitted a letter of resignation to Howard Nettles, who Plaintiff believed to be responsible for human resources matters. Byrd Dep. 12. He felt the working environment was stressful and that he had not done a good job as Operations Manager and so he thought it was best if he moved on from that position. Byrd Dep. 13-14. Both Howard Nettles and Paul Fulbright came to Byrd separately to discuss his concerns and ask him to stay, which he did. Byrd Dep. 14-16. Tony Megna, Defendant's CEO, testified that he also spoke with Byrd to try and talk him into staying. Megna Dep. 74-75 (Ex. 3 to Def. Motion). Byrd, however, testified that he never spoke to Megna about resigning.[3] Byrd Dep. 16.

On January 21, 2016, Plaintiff was promoted to Operations Manager and received a pay increase to $65.00 per hour. Employee File. During her time as Operations Manager, Plaintiff was required to complete biweekly surveys, which included the question "Do you have any complaints, exceptions, suggestions, or concerns." Employee File. Although Plaintiff asserts that she had many of the same concerns as Byrd did, she did not indicate them on the biweekly surveys until October 28, 2016, when she answered the question by stating "I have many; but no one cares–nor do they hear them." Employee File. On the same day, Plaintiff submitted a letter of resignation from her position as Operations Manager. Employee File. The letter stated,

> I will be resigning from my position as Operations Manager effective two weeks from today. Therefore, I am requesting my last day of this position to be effective at closing on November 11, 2016.
>
> Thank you for the opportunity; however, this position is not the best fit for me at this time. I have no other concerns with my employment here at Professional Pharmacy; therefore, I would like to continue as Clinical/Staff Pharmacist with Genesis Healthcare.

---

[3]On one other occasion, Byrd mentioned leaving his employment with Defendant but did not submit a letter of resignation. Byrd Dep. 18-21.

Employee File. Matthews accepted her resignation from the Operations Manager position. Matthews Dep. 23 (Ex. 2 to Def. Motion). He told her that he was fine with her staying on as a staff pharmacist but he would need to get approval from Megna for her to do so. Matthews Dep. 23. Plaintiff told him that she would stay on in the role of Operations Manager until the end of the year. Pl. Dep. 57; Matthews Dep. 49. When asked during her deposition "did you specifically ask him if you could step down from Operations Manager and step into the place of staff pharmacist," Plaintiff replied, "Yes. Yeah. Before I left with him, I said – I asked him, I said, 'So this is okay? If not, if I have to keep this role, I will.' And he said, 'No, it's fine. I understand, you know, just it is a hard position.'" Pl. Dep. 58. Megna testified that he talked to Plaintiff and asked her what he could do to get her to stay on as Operations Manager. Megna Dep. 68-69, 74-75. However, like Byrd, Plaintiff testified that she never spoke to Megna about her resignation. Pl. Dep. 58. Megna testified that he ultimately decided that Plaintiff would not be able to remain on as staff pharmacist following her resignation from the Operations Manager position. Matthews Dep. 27-28; Megna Dep. 70. Defendant was in the process of restructuring the pharmacy as part of its planned expansion of the specialty pharmacy, and Megna felt that he needed pharmacists that were willing to be team players and assume more responsibility if needed, not less, during the transition. Megna Dep. 62-63, 69-73, 97. Plaintiff was given a termination form on December 6, 2016. Matthews Dep. 26; Termination Form (Ex. E to Pl. Resp.).

Following Plaintiff's departure, her responsibilities as Operations Manager were dispersed among all of the remaining pharmacists, but Teresa Webb assumed most of them. Webb Dep. 17 (Ex. 4 to Def. Motion). Another pharmacist, Bobby Tanner, was hired in January of 2017. Webb Dep. 17. He was hired as a staff pharmacist and did not become the Operations Manager. Byrd Dep. 29. Of the six pharmacists at the Darlington office where Plaintiff worked, all were white. Matthew

Dep. 58.

## III.	STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV. DISCUSSION

### A. Resignation or Termination

Defendant first argues that it is entitled to summary judgment as a matter of law because Plaintiff resigned from her position and was not terminated. Plaintiff argues that she resigned only from the managerial position but not from her employment with Defendant. She further argues that, to the extent she is considered to have resigned, her resignation amounts to a constructive discharge.[4] Plaintiff's letter of resignation reveals that she affirmatively resigned from the position she held at the time she submitted her letter. She states "I will be resigning from my position as Operations Manager effective two weeks from today." Employee File. She did not ask to be relieved of the additional responsibilities of Operations Manager. She resigned from her position. Further, her argument that she was constructively discharged from the Operations Manager position is unavailing.

Constructive discharge occurs in the employment discrimination context when an employer deliberately makes the working conditions of the employee so intolerable in an effort to induce the employee to quit or force the employee into involuntary resignation. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353–54 (4th Cir. 1995) (citing Bristow v. The Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). To prove constructive discharge, the working conditions must be "so intolerable

---

[4]Plaintiff did not raise constructive discharge in her complaint.

that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). She complains that Operations Manager position was hard and she was undermined and disrespected. She argues that she lacked support from administration, which made the work environment difficult. The intolerability standard required for constructive discharge claims is higher than the "severe and pervasive" standard required for hostile work environment claims. See Tawwaab v. Virginia Linen Service, Inc., 729 F.Supp.2d 757, 783 (D. Md. 2010) (citing Tutman v. WBBM–TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000) ("[W]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment."); Spencer v. Wal–Mart Stores, Inc., 469 F.3d 311, 317 (3d Cir. 2006) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity of pervasiveness of harassment than the minimum required to prove a hostile work environment."); Griffin v. Delchamps, Inc., 176 F.3d 480 (5th Cir. 1999) (same)). That the work environment was hard or difficult is insufficient to meet such a high standard. Plaintiff fails to submit evidence showing conditions so intolerable that a reasonable person would have felt compelled to resign and, thus, fails to create an issue of fact regarding constructive discharge. Therefore, Plaintiff's claim that she was constructively discharged is without merit.

However, she did suffer an adverse employment action when she was not placed in a staff pharmacist position as she requested. Plaintiff submitted a letter of resignation from her position as Operations Manager and requested to continue as a staff pharmacist. The date she indicated in her letter that she was resigning passed and she continued to work in the Operations Manager capacity until she received her letter of termination. Additionally, she communicated to Matthews her willingness to remain in the position of Operations Manager if that was necessary to maintain her employment. The facts of this case do not fit squarely within a commonly used prima facie

analysis. Whether addressed as a failure to hire or a termination, ultimately as explained below, the court looks to Defendant's legitimate, non-discriminatory reason for its adverse action and Plaintiff's evidence of pretext to resolve this motion.

**B.     Title VII and SCHAL[5]**

    **1.     Discrimination**

Plaintiff alleges that Defendant discriminated against her because of her race and her sex. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under McDonnell Douglas, the plaintiff must first present evidence sufficient to create a prima facie case of discrimination or retaliation. The elements of a prima facie case differ based on the nature of the claim. Rowe v. Marley Co., 233 F.3d 825, 829 (4th Cir. 2000).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, non-discriminatory or non-retaliatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502,

---

[5]Plaintiff's claim under SCHAL is evaluated under the same standards as are used for evaluating her Title VII claims. Burns v. South Carolina Dept. of Transportation, No. 05–3271, 2006 WL 3791361, *5 (D.S.C. Dec. 22, 2006); see also Orr v. Clyburn, 277 S.C. 536, 290 S.E.2d 804, 806 (1982); Tyndall v. National Education Centers, 31 F.3d 209 (4th Cir.1994); S.C.Code Ann. & 1–13–10 et al. (2003).

506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination or retaliation. Reeves, 530 U.S. at 143.

Plaintiff establishes a prima facie case whether analyzed as a failure to hire claim or as a termination claim. Plaintiff sent a letter to Matthews indicating she was resigning from the Operations Manager position and requested to continue as a staff pharmacist. To establish a prima facie case of either race or sex discrimination in the failure to hire context, the plaintiff must present facts showing (1) membership in a protected class; (2) application to the position in question; (3) qualifications for that position; and (4) a failure to hire under circumstances giving rise to an inference of unlawful discrimination. Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005). Plaintiff has presented sufficient evidence to establish a prima facie case. As a black female, she is a member of a protected class. She "applied" for the position of staff pharmacist by stating to her superiors that would like to be placed in that position. She was qualified for that position because she had held it in the past, and a white male pharmacist was given the position instead of Plaintiff, which is sufficient at the prima facie stage to give rise to an inference of discrimination. See, e.g., King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (noting that one type of circumstance giving rise to an inference of discrimination is when the plaintiff is replaced by someone outside her protected class).

Plaintiff also continued to work in her position as Operations Manager past the date she indicated in her letter[6], and she testified that she told Matthews she would continue as Operations Manager if it was necessary to maintain her employment with Defendant. However, Matthews gave Plaintiff a termination form dated December 6, 2016, terminating her employment. Thus, analyzing the facts as a termination case, Plaintiff would need to establish "that: (1) she is a member of a protected class; (2) she 'suffered an adverse employment action'; (3) her job performance was satisfactory; and (4) the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" Swaso v. Onslow Cty. Bd. of Educ., 698 Fed.Appx. 745, 747 (4th Cir. 2017) (citing Adams v. Tr. of Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011)). The only differing factor between failure to hire and termination is satisfactory job performance, and Matthews testified that he had no concerns with Plaintiff's job performance. Matthews Dep. 55. To the extent the asserted lack of being a team player was an indication of Plaintiff's job performance, the validity of this concern involves an issue of fact as discussed below.

Accordingly, the burden shifts to Defendant to present a legitimate, nondiscriminatory reason for its employment decision. Megna, Defendant's CEO who made the decision not to place Plaintiff in the staff pharmacist position, testified that he wanted employees who were willing to be team players and who would take on more responsibility if necessary, not less, as Plaintiff had indicated was her intent by resigning from the Operations Manager position.

As such, the burden returns to Plaintiff to show that this reason given by Defendant was not its true reason but merely pretext for a discriminatory or retaliatory reason. Plaintiff argues that, unlike her, Byrd was allowed to go back to the staff pharmacist position from the Operations

---

[6]Plaintiff testified that she told Matthews in person that she would remain in the Operations Manager position until the end of the year.

Manager position. However, Byrd did not resign from or even ask to be removed from the Operations Manager position. Defendant made the decision to place Plaintiff into that position instead of Byrd because they did not like the way things were going with Byrd as Operations Manager. In addition, Byrd had taken on a new role as Defendant started establishing its Specialty Pharmacy, and Matthews felt it would be better to put Plaintiff in the Operations Manager position and let Byrd focus on the Specialty Pharmacy.

Sometime after Byrd, a white male, was removed from the Operations Manager position, he submitted a resignation letter to resign from employment with Defendant. He felt he had done a poor job as evidenced by his removal from the Operations Manager position, the job was stressful, and he was dealing with additional stressors in his personal life. Once they received his letter, both Howard Nettles and Paul Fulbright came to Byrd separately to discuss his concerns and ask him to stay, which he did. Byrd Dep. 14-16. There is no indication in the record that Nettles or Fulbright had to get Megna's approval to keep Byrd. Although Megna testified that he spoke to Byrd to ask him to stay, Byrd testified that Megna never spoke to him. With respect to Plaintiff, although Matthews told her that he was okay with her stepping down as the Operations Manager but staying on as a staff pharmacist, he told her that he had to get Megna's approval to do so. Megna testified that he also tried to talk Plaintiff into staying in the Operations Manager position but Plaintiff declined. Plaintiff, however, testified Megna never spoke to her. Further, Plaintiff testified that she told Matthews that if she had to stay in the Operations Manager position, she would. Questions of fact exist regarding Megna's involvement with the retention of Byrd and the release of Plaintiff.

Plaintiff also argues that she can show pretext because the reason given in Defendant's response to her EEOC charge differs from the reason set forth in this litigation. The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions can be

-11-

probative of pretext. EEOC v. Sears Roebuck, 243 F.3d 846, 852–53 (4th Cir.2001). In response to questions asked of Defendant by the EEOC review panel, Helen Carroll, Defendant's Compliance Officer, stated that Plaintiff was not given another position because the only one available at the time was the "Workflow Manager" position. Emails (Ex. H to Pl. Resp.). The response further stated "[a]fter about a month it became apparent that the pharmacy required a workflow manager pharmacist over an additional staff pharmacist. . . . Therefore, the decision was made to terminate [Plaintiff] and replace her with a pharmacist that could be trained to be the workflow manager." Emails (Ex. H to Pl. Resp.). Megna testified that when Plaintiff turned in her resignation letter, he asked her to stay on a while longer while he thought about whether to put her in another position. Megna Dep. 61. He stated that the pharmacy was in the middle of a reorganization at the time because it was developing a specialty pharmacy and "[e]verybody needs to step up because no matter who is Operations Manager, somebody is not going to be there, they're going to take a vacation, they're going to take a day off. Everybody has to step up and these are professionals. You know, they need to work together. . . . They need to be able to fill in wherever they are needed." Megna Dep. 63-64. Megna stated that Plaintiff "was not good for the restructuring that we were doing for the pharmacy, because I was going to have to move people all around depending on what was occurring at different times." Megna Dep. 65. These differing reasons for the employment action taken against Plaintiff are probative of pretext.

In addition to the conflicting testimony regarding Megna's involvement with the employment acts taken with respect to Byrd and Plaintiff and the differing reasons given for the action taken against Plaintiff, the record also shows that Defendant hired Tanner, a white male, shortly after Plaintiff's employment ended who served as a staff pharmacist, the position Plaintiff asked to return to, and, despite the evidence that Defendant needed someone who could fill the Operations Manager

position, Tanner never filled that position. Finally, at the time of Plaintiff's employment with Defendant, she was the only black pharmacist at her location. These facts, considered together, are sufficient to create a jury question as to whether the reasons given for the adverse employment action against Plaintiff were true or were pretext for a discriminatory reason. Therefore, summary judgment is not appropriate on Plaintiff's Title VII and SCHAL race discrimination causes of action.

### 2. Retaliation

Plaintiff also alleges in her complaint that Defendant retaliated against her for "complaining that Caucasian employees were being treated with more respect and in a better way than she was." Compl. ¶ 22. Title VII also makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case for retaliation under Title VII, a plaintiff must show that 1) she engaged in a protected activity, 2) she suffered an adverse employment action and 3) there was a causal link between the protected activity and the adverse employment action. Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).

To qualify as protected activity, the employment practices opposed may be either "actually unlawful under Title VII" or reasonably believed by the employee to be unlawful. Boyer–Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397 (4th Cir. 2005)). Complaints about management activities that would not constitute unlawful discrimination do not count as protected activity. See Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216–17 (4th Cir. 2002). Plaintiff alleges in her complaint that Defendant retaliated against her for "complaining that Caucasian employees were being treated with more respect and in

-13-

a better way than she was." Compl. ¶ 22. The record reflects that Plaintiff made a complaint on the day she submitted her resignation letter when she stated on the biweekly survey that she had many complaints, exceptions, suggestions, or concerns but no one cared to listen to them. She also sent a text to Fulbright after her resignation letter in which she complained that the decisions she made regarding technicians were overturned without her input. Pl. Text to Fulbright (Ex. G to Pl. Resp.). She also complained in that text that favoritism was being shown towards the technicians. Pl. Text to Fulbright. However, in neither of these complaints does she mention race or gender. These complaints did not communicate opposition to an alleged discriminatory practice and are, thus, not protected activities within the meaning of Title VII. Therefore, Plaintiff's retaliation claims under Title VII and SCHAL fail and summary judgment is appropriate.

    **C.    Wrongful Termination in Violation of Public Policy**

Plaintiff also asserts a state law claim for wrongful termination in violation of public policy. Generally speaking, South Carolina law allows an employer to discharge an employee without incurring liability for good reason, no reason, or bad reason. Culler v. Blue Ridge Elec. Coop., 309 S.C. 243, 245, 422 S.E.2d 91, 92 (1992). However, the South Carolina Supreme Court has recognized a "public policy" exception to this doctrine. Ludwick v. This Minute of Carolina, Inc., 287 S.C. 219, 225, 337 S.E.2d 213, 216 (1985). In Ludwick, the court held that an employee has a tort cause of action for wrongful discharge where there is a retaliatory discharge of the at-will employee in violation of a clear mandate of public policy. Id. The public policy exception clearly applies in cases where the employer either (1) requires the employee to violate the law, or (2) the reason for the employee's termination is itself a violation of criminal law. Lawson v. South Carolina Dep't of Corrections, 340 S.C. 346, 350, 532 S.E.2d 259, 260 (2000).

Plaintiff alleges that she was discharged because of her opposition to perceived potential

criminal activity. Compl. ¶ 33. At some time during Plaintiff's employment[7], a meeting occurred regarding an incident of pill diversion with administrators and the pharmacists who were present at the time of the incident. Webb Dep. 28-29. Plaintiff had been on vacation when the incident occurred so she was not at the meeting. Webb Dep. 28-29. As the Pharmacist in Charge, Webb was responsible for investigating the incident. Matthews Dep. 56-57. Webb decided she wanted to wait until she could speak with the pharmacist at issue and address it with him before reporting the matter. Webb Dep. 30. Webb told Plaintiff about the incident after the meeting. Webb Dep. 29. Several pharmacists, including Plaintiff, expressed their concern to Webb that the matter should be reported. Webb Dep. 29-30. There is no evidence in the record that Webb instructed Plaintiff not to report the incident. Plaintiff was neither asked to violate the law, nor was her release from employment a violation of criminal law. Although the public-policy exception is not limited to these two situations, courts are to "exercise restraint when undertaking the amorphous inquiry of what constitutes public policy." Taghivand v. Rite Aid Corp., 411 S.C., 240, 243-44, 768 S.E.2d 385, 387 (S.C. 2015). South Carolina has "specifically recognized no other" situations. Id. Further, Plaintiff did not voice her concerns to Matthews, Megna or any other administrator with authority to make employment decisions regarding her, Pl. Dep. 58-59, nor is there any evidence that Webb informed anyone in administration of Plaintiff's concerns. Accordingly, Plaintiff fails to present sufficient evidence to create an issue of fact on her wrongful discharge claim and summary judgment is appropriate.

## V. CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary

---

[7]The record does not disclose the proximity in time between this occurrence and Plaintiff's termination.

Judgment (ECF No. 44) be granted in part and denied in part. Specifically, it is recommended that summary judgment be denied as to Plaintiff's Title VII and SCHAL[8] race discrimination claim and granted as to all other claims.

          s/Thomas E. Rogers, III
          Thomas E. Rogers, III
          United States Magistrate Judge

July 1, 2019
Florence, South Carolina

---

[8]The SCHAL includes the provision that

> No action may be brought under this chapter if an action alleging essentially the same facts and seeking relief for the same complainant has been brought in any federal court. Any action brought under this chapter shall be promptly dismissed if an action alleging essentially the same facts and seeking relief for the same complainant is brought in any federal court.

S.C. Code Ann. § 1-13-90(d)(8). This court has held that, while this provision does not require dismissal of a SCHAL claim at the Rule 12 stage when a Title VII claim has also been asserted, the plaintiff must elect a remedy if the claims survive summary judgment. Gleaton v. Monumental Life Ins. Co., 719 F. Supp. 2d 623, 630 (D.S.C. 2010).